IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
     v.                        )      Criminal Action No.
                               )      06-00260-01/02-CR-W-ODS
PORFIRIO ALMEIDA-PEREZ, and    )
JOSE ALMEIDA-PEREZ,            )
                               )
              Defendants.      )

## REPORT AND RECOMMENDATION TO DENY
## DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE

Before the court is a motion to suppress filed by
defendant Porfirio Almeida-Perez and a motion to suppress
filed by defendant Jose Almeida-Perez.  Both argue that the
warrantless search of their residence was conducted without
valid consent and that their subsequent statements were made
in violation of Miranda v. Arizona.  I find that defendants
voluntarily consented to the search of their residence and
voluntarily waived their Miranda rights.  Therefore,
defendants' motions to suppress should be denied.

## I.    BACKGROUND

On August 8, 2006, an indictment was returned charging
both defendants with two counts of possessing firearms while
in the United States illegally, in violation of 18 U.S.C. §§
922(g)(5)(A) and 924(a)(2).  Defendant Jose Almeida-Perez
filed a motion to suppress on August 18, 2006 (document

number 31).  Defendant Porfirio Almeida-Perez filed a motion to suppress on August 21, 2006 (document number 32).  The government filed a response to the motions on September 1, 2006 (document number 39).

I held an evidentiary hearing on defendants' motions on three separate days:  September 6, 2006; October 24, 2006; and November 8, 2006.  During each part of the hearing, the government appeared by Assistant United States Attorney Rudolph R. Rhodes.  Defendant Porfirio Almeida-Perez was present, represented by Henri Watson.  Defendant Jose Almeida-Perez was present, represented by John Lozano.

The following witnesses testified during the hearing:

1.   Detective Luis Ortiz, Kansas City, Missouri, Police Department

2.   Special Agent Tracy Raggs, Immigration and Customs Enforcement

3.   Sergio Javier Almeida-Alvarez

4.   Maria Juarez Galaviz, wife of defendant Porfirio Almeida-Perez

5.   Detective Michael Miller, Kansas City, Missouri, Police Department

6.   Urbana Perez-Lopez, mother of defendants Porfirio Almeida-Perez and Jose Almeida-Perez

7.   Maria Almeida-Perez, sister of defendants Porfirio Almeida-Perez and Jose Almeida-Perez

8.   Defendant Porfirio Almeida-Perez

9.   Defendant Jose Almeida-Perez

In addition, the following exhibits were admitted into evidence:

P. Ex. 1  Consent to search form signed by Porfirio, Jose, and Maria Almeida-Perez

P. Ex. 2  <u>Miranda</u> waiver form, written in Spanish, and signed by Jose Almeida-Perez

P. Ex. 3  <u>Miranda</u> waiver form, written in Spanish, and signed by Porfirio Almeida-Perez

P. Ex. 4  Notice of Rights and Request for Disposition for Porfirio Almeida-Perez

P. Ex. 5  Notice of Rights and Request for Disposition for Jose Almeida-Perez

P. Ex. 6  Investigative Report dated July 7, 2006, containing statement of Jose Almeida-Perez

P. Ex. 7  Investigative Report dated July 7, 2006, containing statement of Porfirio Almeida-Perez


D. Ex. 1  Large photograph of residence

D. Ex. 2  Photograph of the back of the residence

D. Ex. 2A Photograph of the side and front of the residence

D. Ex. 3  Photograph of porch and front door

D. Ex. 3A Photograph of three individuals posing against living room wall

D. Ex. 3B Photograph of two individuals posing against living room wall

Case 4:06-cr-00260-ODS   Document 62   Filed 12/13/06   Page 3 of 51

D. Ex. 4   Photograph of the living room, except that on July
           6, 2006, the couch was not in that room as it is
           depicted in the photograph

D. Ex. 5   Photograph of bedroom from the living room

D. Ex. 6   Photograph of bedroom from the living room

D. Ex. 7   Photograph of bedroom from the living room

D. Ex. 8   Photograph of the bed in Porfirio's bedroom

D. Ex. 9   Photograph of the bed in Porfirio's bedroom with
           an "X" marking the spot where the gun was found

D. Ex. 11  Photograph of living room and part of kitchen

D. Ex. 18  Photograph of bed

     After the hearing, additional briefing was filed.

Defendant Jose Almeida-Perez filed his supplemental

suggestions on November 15, 2006 (document number 56).

Defendant Porfirio Almeida-Perez filed his supplemental

suggestions on November 15, 2006 (document number 57).  The

government filed its supplemental response on November 22,

2006 (document number 58).  Without requesting leave to do

so, the defendants both filed supplemental replies on

December 7, 2006, Jose Almeida-Perez's as document number 59

and Porfirio Almeida-Perez's as document number 60.

## II.  *EVIDENCE*

     On the basis of the evidence presented at the

suppression hearing, I submit the following findings of

4

fact:

1. On June 22, 2006, Detective Luis Ortiz received information from a confidential informant that the residents at 5115 East 22nd Street had been selling large quantities of narcotics and also had weapons (1Tr. at 6-7, 32, 61-62)[1]. Detective Ortiz performed spot-check surveillance on the house, driving by to see who was present (1Tr. at 7). He also conducted normal surveillance on July 5, 2006, and July 6, 2006 (1Tr. at 7). Special Agent ("SA") Tracy Raggs from Immigration and Customs Enforcement ("ICE") was with Detective Ortiz during the surveillance on July 6, 2006 (1Tr. at 7-8, 91, 105). Together they observed several men and women entering and exiting the residence (1Tr. at 8).

2. At approximately 1:30 p.m. on July 6, 2006, Detective Ortiz and SA Raggs decided to conduct a knock and talk (1Tr. at 8, 37, 77, 91). During a knock and talk, the officers knock on the door and ask whoever answers for permission to talk about the investigation (1Tr. at 8, 37; 2Tr. at 92)[2]. Detective Ortiz requested two other officers

---

[1]"1Tr." refers to the transcript of the suppression hearing held on September 6, 2006.

[2]"2Tr." refers to the transcript of the suppression hearing held on October 24, 2006.

5

to assist by watching the back door (2Tr. at 91).

    3.    Detective Ortiz and SA Raggs went to the front
door, while Sergeant Jay Pruetting and Detective Michael
Miller went to the back of the residence (1Tr. at 8, 39,
106; 2Tr. at 93).  Their purpose was to stop anyone who ran
out the back door (2Tr. at 94).

    4.    There was an Hispanic man sitting on a chair on
the front porch near the door (1Tr. at 9, 37-38, 91, 106).
His name was Sergio Almeida-Alvarez (1Tr. at 9, 39, 106).
During the previous surveillance, Detective Ortiz had seen
Sergio Almeida-Alvarez going in and out of the residence
(1Tr. at 39, 73).  Detective Ortiz introduced himself and SA
Raggs, he said they were with the Gang Squad and Immigration
and Customs Enforcement, he said they were conducting a
narcotics investigation, and then he asked if they could
talk about it inside (1Tr. at 9, 40, 91-92).

    5.    Sergio Almeida-Alvarez was very cooperative and he
invited the officers inside the residence (1Tr. at 9, 92).
He opened the door to go in, he did not knock on the door
(1Tr. at 40).  Neither Detective Ortiz nor SA Raggs had
their guns drawn at the time (1Tr. at 41, 95, 108).

    6.    The three men went inside the residence, and
Detective Ortiz observed three or four other occupants

inside (1Tr. at 9, 41, 92). They were sitting in chairs
watching television (1Tr. at 42, 60). He identified himself
and SA Raggs as law enforcement and explained the reason why
they were there (1Tr. at 9, 42-43, 44). Detective Ortiz
spoke in Spanish during all of his conversations with the
occupants of the house (1Tr. at 14, 41). Detective Ortiz
asked if there was anyone else inside the residence (1Tr. at
10, 44). They motioned toward the bedrooms and said that
Porfirio was there (in the northeast bedroom), and that Jose
and Maria Almeida-Perez were there (in the west bedroom)
(1Tr. at 10).

 7. Detective Ortiz asked if it was OK if he knocked
on the bedroom door and called those people into the living
room (1Tr. at 10, 44). Maria Juarez Galaviz said, "yes"
(1Tr. at 10, 44). SA Raggs stayed in the living room while
Detective Ortiz knocked on the northeast bedroom door (1Tr.
at 10, 92, 115). They were the only two officers in the
residence (1Tr. at 10).

 8. Detective Ortiz identified himself as a police
officer as he opened the bedroom door (1Tr. at 11).
Detective Ortiz observed a black shotgun next to the bed
where Porfirio Almeida-Perez was sleeping (1Tr. at 11, 46,
57). He observed the shotgun immediately upon stepping into

the room (1Tr. at 57, 58). Detective Ortiz again identified himself as a police officer and asked Porfirio to come out to the living room (1Tr. at 11, 47). Detective Ortiz spoke in a conversational tone (1Tr. at 11).

9. Porfirio went out to the living room (1Tr. at 11, 93, 115). Because Detective Ortiz had seen the shotgun and knew that SA Raggs was alone with multiple people in the living room, Detective Ortiz radioed Detective Miller to come inside so he could keep an eye on the occupants with SA Raggs (1Tr. at 12). Detective Miller came inside just to make sure none of the occupants did anything to endanger Detective Ortiz or SA Raggs (2Tr. at 97).

10. Once Detective Miller was inside, Detective Ortiz knocked on the west bedroom door (1Tr. at 12). He identified himself as a police officer and opened the door (1Tr. at 12). To his left, he observed Maria lying on a bed, and Jose Almeida-Perez was lying on the floor to the right (1Tr. at 12, 58, 59; 3Tr. at 5)[3]. There was a rifle lying on the floor next to Jose (1Tr. at 12, 58).

11. Both of the weapons had been found in plain view and were observed immediately upon opening the bedroom doors

_____

[3]"3Tr." refers to the transcript of the suppression hearing held on November 8, 2006.

8

(1Tr. at 12).

12.  Detective Ortiz again identified himself as a
police officer and asked Jose and Maria to come to the
living room, which they did (1Tr. at 13, 47-48, 93).  Again,
he spoke in a conversational tone (1Tr. at 13).

13.  Once everyone was in the living room, Detective
Ortiz again said that he and the other officers were
conducting a narcotics investigation along with Immigration
and Customs Enforcement (1Tr. at 13).  He said the reason
why ICE was involved was because they received information
that the people living in that residence were in the country
illegally (1Tr. at 13).  All of the occupants were sitting
in chairs or on the floor in the living room against a wall
(1Tr. at 49, 50).

14.  Detective Ortiz asked who was responsible for the
residence, and he was told Porfirio, Jose, and Maria[4] (1Tr.
at 13-14, 48, 117).  Detective Ortiz spoke to Porfirio's
parents, and they said they were visiting from Mexico and
did not live there (1Tr. at 49).  All of the other occupants
stated they did not live in the house, except Jose,
Porfirio, and Porfirio's wife Maria (1Tr. at 49).

_____

[4]Porfirio was referring to his wife Maria Juarez
Galaviz, not his sister Maria Almeida-Perez (1Tr. at 93).

9

15. Detective Ortiz then asked for permission to search the residence for narcotics, weapons, and currency (1Tr. at 13, 50, 51-52). Porfirio, Jose, and Maria showed a desire to cooperate, said they had nothing to hide, and stated that they did not have any problem with the officers searching the residence (1Tr. at 14, 71).

16. Detective Ortiz presented a consent to search form (1Tr. at 14). Detective Ortiz explained that it was not a warrant, it was a document they could sign giving consent to search the residence (1Tr. at 14, 51, 78). He said the form indicated that they had given him permission to search for narcotics, weapons, or U.S. currency in the house (1Tr. at 78). He told them they did not have to sign the form if they did not want to, they did not have to give consent to search if they did not want to (1Tr. at 14-15, 78-79). The form was written in English because the police department does not have a consent to search form printed in Spanish (1Tr. at 50; P. Ex. 1). Detective Ortiz did not read the form to Porfirio, Jose, and Maria, rather he explained it to them (1Tr. at 16). Porfirio, Jose, and Maria then signed the form (1Tr. at 16, 52, 79, 94-95; P. Ex. 1).

17. Because no protective sweep had been performed, Detective Ortiz said he was going to call more officers to

10

help with the search (1Tr. at 16).  The residents said that there was no one else in the house, but it was OK if the other officers wanted to come in (1Tr. at 16).  Several other officers entered the residence (1Tr. at 16).

18.  Detective Ortiz asked Porfirio if there were any narcotics in the residence, and Porfirio said there was some cocaine (1Tr. at 16, 95).  Porfirio began looking for the cocaine in the kitchen (1Tr. at 16; 2Tr. at 165).  He looked several places but could not find it (1Tr. at 17).  He then said everyone in the residence uses cocaine and someone probably used it (1Tr. at 17).

19.  While the house was being searched, SA Raggs talked to Porfirio, Jose, and Maria about their immigration status (1Tr. at 96, 119, 123).  He had talked to the other individuals while Detective Ortiz was knocking on the bedroom doors (1Tr. at 124).  SA Raggs asked for their names, birth dates, where they were from, whether they were here legally, and if they had ever been deported (1Tr. at 96).  SA Raggs did not have his gun drawn, and no one was placed in handcuffs (1Tr. at 96, 98).  Jose said he was here illegally (1Tr. at 96).  Porfirio said he was here illegally (1Tr. at 96-97, 125).  No other questions were asked of Jose or Porfirio (1Tr. at 97).

11

20.  At the conclusion of the search, police had recovered three rifles, two shotguns, two grams of cocaine, and $19,353 cash (1Tr. at 17, 97).  One of the shotguns was found in the attic in a gun case (1Tr. at 17-18).  The cocaine was found inside of a tennis shoe in the west bedroom where Jose and Maria had been sleeping (1Tr. at 18). The cash was found in the northeast bedroom where Porfirio was sleeping (1Tr. at 20).  A drug dog was brought to the scene and alerted positively to the cash as having the scent of illegal drugs (1Tr. at 20, 82).

21.  At no time did Porfirio, Jose, or Maria refuse to consent to the search or object while the search was taking place (1Tr. at 18, 19, 98; 3Tr. at 14, 15).  Instead, they were very cooperative (1Tr. at 98).  No officer made any threats or promises, and no one was placed in handcuffs (1Tr. at 18, 19, 51, 95, 98).  Neither Porfirio nor Jose appeared to be intoxicated or under the influence of drugs at the time they signed the consent form (1Tr. at 18).

22.  Porfirio's and Jose's mother told the officers that the $20,000 cash was from the sale of a truck (1Tr. at 20).

23.  The entire incident, from the time the officers first entered the house until the search was completed, took

12

about one hour (1Tr. at 77).

24. After the drugs and guns had been seized, Porfirio and Jose were placed under arrest for possession of illegal drugs and for possessing firearms while in the country illegally (1Tr. at 19). Neither Porfirio nor Jose made any statements while in the house, other than Porfirio's comment that everyone in the house uses cocaine (1Tr. at 19). The other occupants of the house were asked to sit in the back yard (1Tr. at 54). Occupants are normally removed from the house when a drug dog comes through (2Tr. at 108).

25. On July 7, 2006, Detective Ortiz interviewed Jose Almeida-Perez at the police headquarters (1Tr. at 20, 21). He advised Jose of his <u>Miranda</u> rights by reading a <u>Miranda</u> waiver form to him (1Tr. at 21). The form was written in Spanish (1Tr. at 21, 23; P. Ex. 2). Detective Ortiz read the form word for word in Spanish, and at the conclusion asked Jose if he understood his rights and if he was willing to answer questions (1Tr. at 22, 88). Jose said he did understand his rights, and he signed the form (1Tr. at 23).

26. It did not appear to Detective Ortiz that Jose was under the influence of drugs or alcohol (1Tr. at 24). Jose appeared to understand his rights, his speech was coherent, he did not request an attorney, and he did not invoke his

13

right to remain silent (1Tr. at 24). No promises or threats were made to get Jose to make a statement (1Tr. at 24). Jose agreed to answer questions without having an attorney present (1Tr. at 24).

27. Jose told Detective Ortiz that the guns found in the residence were used to go rabbit hunting (1Tr. at 25). He did admit to possessing the cocaine (1Tr. at 25).

28. That same day, Detective Ortiz met with Porfirio Almeida-Perez (1Tr. at 27). He advised Porfirio of his Miranda rights by reading a Miranda waiver form to him (1Tr. at 27-28). The form was written in Spanish (1Tr. at 29; P. Ex. 3). Detective Ortiz read the form word for word in Spanish, and at the conclusion asked Porfirio if he understood his rights (1Tr. at 29). Porfirio said he did understand his rights, and he signed the form (1Tr. at 29).

29. It did not appear to Detective Ortiz that Porfirio was under the influence of drugs or alcohol (1Tr. at 29). Porfirio appeared to understand his rights, his speech was coherent, he did not request an attorney, and he did not invoke his right to remain silent (1Tr. at 29-30). No promises or threats were made to get Porfirio to make a statement (1Tr. at 30).

14

30.  Porfirio admitted that the guns and cocaine at the residence were his (P. Ex. 7).  He stated that the guns were used to hunt rabbits (P. Ex. 7).

31.  On July 10, 2006, SA Raggs met with Porfirio and Jose with regard to their immigration proceedings (1Tr. at 99).  He met with Porfirio first, and provided him with a notice of rights and request for disposition, which informs the person of his rights either to try to stay in the United States or go back to his country of citizenship (1Tr. at 100).  Porfirio read the form, written in Spanish, and then he checked the box indicating he was here illegally and wished to be returned to his country of citizenship (1Tr. at 101).  SA Raggs did not ask any questions about the drugs or weapons, rather he only asked questions such as name, date of birth, parents' names, address, employment (1Tr. at 101; 2Tr. at 170).

32.  SA Raggs obtained Porfirio's criminal history and learned that he had been returned to Mexico several times before (1Tr. at 127).

33.  Jose Almeida-Perez was given an identical form, and he hesitated while trying to read the form in Spanish (1Tr. at 102-103).  Therefore, another ICE worker who speaks Spanish read the form to Jose (1Tr. at 102-103).  Jose said

15

he wanted to go back home like his brother (1Tr. at 103).
Jose was not asked about the criminal offense, rather he was
questioned only about biographical information like Porfirio
(1Tr. at 103).

34. Sergio Javier Almeida-Alvarez testified during the
hearing. His testimony in some areas was inconsistent with
the findings of fact I have listed above. Below is a
summary of that conflicting testimony:

Sergio was at 5115 East 22nd Street on July 6,
2006, but he does not live there (2Tr. at 5, 16). He
was living at 2435 Winner (2Tr. at 6). He was at the
22nd Street residence visiting his cousins (2Tr. at 6).
He had been inside watching television, but he went
outside, sat in a chair on the porch, and was "just
looking around" (2Tr. at 7, 24).

He saw the police arrive and two officers
approached him (2Tr. at 8-9). They said, "police" and
then Detective Ortiz said, "Let's go inside because I
want to talk to you." (2Tr. at 9). Sergio opened the
door without asking permission to go inside (2Tr. at
10). Inside the house was Urbana Perez-Lopez sitting
on the floor watching television, Maria Juarez who was
also sitting on the floor, Vinancio Almeida who is

16

Urbana's husband, and Manuel Almeida  (2Tr. at 11-12).
Detective Ortiz told them all to line up against the
wall with their hands up (2Tr. at 12, 18).  After they
lined up against the wall (facing the wall), the
officers searched them (2Tr. at 15).

About five minutes after the police entered the
house, a female officer arrived to watch the occupants
while the two men searched the house (2Tr. at 21-22).
Before she arrived, Porfirio and Jose came into the
living room (2Tr. at 22).

Sergio observed some officer who was not Detective
Ortiz go into Porfirio's bedroom with the gun in his
hand pointed forward, and he then came out of the room
with Porfirio (2Tr. at 36).

They were all made to stand with their hands
against the wall for about a half hour (2Tr. at 30).
They were told that they could not move (2Tr. at 30).

The officers told Porfirio, Jose, and Maria to
sign a paper or they would arrest everyone (2Tr. at 30-
31).

Sergio never said anything to the officers in the
house (2Tr. at 21).  He never heard any officer ask for
permission to search the house (2Tr. at 32).  He never

17

heard any officer ask for permission to knock on the
bedroom doors (2Tr. at 32). Sergio heard Detective
Ortiz say that there were guerillas present (2Tr. at
33).

35. I do not find this testimony credible for the
following reasons:

a. Sergio had been in the United States for eight
months at the time of his testimony (2Tr. at 39). He is
employed in construction and he is paid in cash (2Tr. at
39). He admitted he is in the United States illegally (2Tr.
at 39). Sergio's criminal background, i.e., unlawfully
entering the United States and working for cash, diminish
his credibility.

b. When Sergio was asked how he came to be in the
United States, he was evasive in answering the questions
(2Tr. at 40). For example:

Q. How did you get into the United States?

A. I came because -- well, they told me to come.

Q. Who did?

A. Some relatives.

Q. Some relatives? Who?

A. An aunt.

Q. An aunt. Does she have a name?

18

A.    Yes.

Q.    And what is her name?

A.    Norma Alicia.

Q.    Is that her complete name?

A.    Almeida-Perez.  Yes.

Q.    And is she here in Kansas City?

A.    No.

Q.    Where is she at?

A.    California.

(2Tr. at 40-41).

It is not plausible that Sergio's aunt would encourage him to come to the United States and that in response to her encouragement, he would come to this country but settle a few thousand miles from where that aunt resides.

c.    Sergio was asked whether he was concerned about someone from Immigration being at the house considering his illegal status in this country.  He said, "No.  Because I didn't know what was going on." (2Tr. at 41).  When asked again, he changed his testimony and said, "Yes.  I was also worried about that." (2Tr. at 42).

d.    Sergio testified that he said nothing to the officers, he did not even tell them his name (2Tr. at 21, 44).  When questioned further about his responses to

19

immigration questions, he testified that he did answer their questions about his being in the country illegally (2Tr. at 42, 44).

e. Sergio has been stopped by police before for minor things like traffic problems (2Tr. at 43). He did not tell those officers about his illegal status in the country (2Tr. at 43).

f. Sergio was asked whether he could observe the officers going into the bedrooms, and he said he did not see what happened "because they didn't ask for permission." (2Tr. at 15-16). This answer was not responsive to the question, and it appeared to me that Sergio was attempting during his testimony to repeat key phrases he knew were important to the defendants' case. Further, it conflicts with his testimony that an officer entered Porfirio's bedroom with his gun drawn and pointed forward.

g. Sergio was asked how he knew that the officers were searching the house, and he testified, "Because while we were in the living room, they just left and went to search the house and they didn't ask for permission to search it." (2Tr. at 21). Again, whether permission was sought was not responsive to the question. Sergio appeared to be attempting to repeat key phrases he knew were

20

important to the defendants' case.

h. Sergio was asked whether he felt he had a choice to go inside based on the way the officers were walking as they approached the porch (2Tr. at 27). He said, "No. Well, I was supposed to ask for permission to enter, but I didn't." (2Tr. at 27). This is yet another example of Sergio apparently attempting to repeat phrases he believed were important to the case.

i. Sergio testified that he was required to knock to enter the house (2Tr. at 37); however, Detective Ortiz and SA Raggs observed him coming and going from the residence.

j. Sergio was asked if his facing the wall resulted in his not being able to see anything else, and he said, "Because I was nervous. I didn't know what was going on." (2Tr. at 19). Again, this is not responsive to the question and appears to be his attempt to testify about being nervous without waiting to be asked.

k. Sergio was asked whether any officer pointed a gun at him while he was in the residence, and Sergio testified that he could not remember (2Tr. at 19). It is implausible that anyone would be unable to remember whether a gun had been pointed at him. In addition, this testimony conflicts with his earlier testimony that no one pointed a gun at him

21

(2Tr. at 17).

l.   Sergio testified that he observed some officer who
was not Detective Ortiz go into Porfirio's bedroom with the
gun in his hand pointed forward, and he then came out of the
room with Porfirio (2Tr. at 36).  Yet Maria Juarez Galaviz
testified that Detective Ortiz went into the bedroom to get
Porfirio (2Tr. at 52).  And Sergio had previously testified
that he did not see the officers go into the bedrooms.
Finally, he also previously testified that only Detective
Ortiz and SA Raggs were present until after Porfirio and
Jose had been brought out of the bedrooms.  Then a female
officer arrived.  Therefore, not only did he give multiple
versions of what occurred, he was unable to describe the
officer who held a gun while going into Porfirio's bedroom
other than to say "some officer."

36.  Maria Juarez Galaviz testified during the hearing,
and some of her testimony was inconsistent with the findings
of fact listed above.  Maria Juarez Galaviz is the wife of
defendant Porfirio Almeida-Perez (2Tr. at 46).  They had
lived at 5115 East 22nd Street for approximately two months
at the time of this incident (2Tr. at 46).  Below is a
summary of her conflicting testimony:

22

When Sergio and the two officers entered her house, she heard Detective Ortiz say he had been told there were some guerillas (2Tr. at 51, 52). The officers told everyone to lean against the wall and they drew their guns and pointed them at the group in the living room (2Tr. at 70). Detective Ortiz went in to search the bedrooms (2Tr. at 52). He did not ask for permission to go into the bedrooms (2Tr. at 56). Detective Ortiz was holding a gun when he went into the bedroom (2Tr. at 56-57).

They were told to stand against the wall with their hands up (2Tr. at 52). No one asked for permission to search the house (2Tr. at 71, 72).

One of the officers had a bat and was swinging it while he was looking at the people in the living room (2Tr. at 73-74). He was swinging the bat for about ten minutes (2Tr. at 74). He was swinging the bat while Detective Ortiz was in the room with Porfirio (2Tr. at 74). The day before, Porfirio had gotten hurt with a nail and someone gave him the bat to use as a cane (2Tr. at 75). The bat was in their bedroom (2Tr. at 75).

The search took about three hours, but the police were at the house longer than that (2Tr. at 62).

Once the search of the house was completed, Detective Ortiz asked her to sign a document (2Tr. at 63). The detective asked her who owned the house, and she said Porfirio (2Tr. at 64). The detective then said to sign the paper (2Tr. at 64). He did not explain what the paper said, and she signed it because she was afraid (2Tr. at 64). He had told her if she did not sign the paper, they would all be arrested (2Tr. at 64).

37. I do not find this testimony to be credible for the following reasons:

a. Ms. Galaviz is in the United States illegally, as is every other member of her household (2Tr. at 66). According to her husband and her brother-in-law, Jose, Ms. Galaviz uses cocaine. Her willingness to unlawfully enter the United States and allegedly use cocaine diminishes her credibility.

b. Maria Juarez Galaviz testified that Detective Ortiz went into the bedroom to get Porfirio before any other officers arrived (2Tr. at 52). Yet, Sergio testified that he observed some officer who was not Detective Ortiz go into

24

Porfirio's bedroom with the gun in his hand pointed forward, and he then came out of the room with Porfirio (2Tr. at 36). Urbana Perez-Lopez testified that "some officers" went into the room to get Porfirio and "some officers" went into the other bedroom to get Jose (2Tr. at 123). And Porfirio Almeida-Perez testified that two officers came into his room and woke him up (2Tr. at 157). All of these versions of how many officers were present and who went in to get Porfirio are significantly contradictory.

c.    Ms. Galaviz testified that she signed the consent to search because she had been threatened with arrest if she did not (2Tr. at 64). As an illegal alien, Ms. Galaviz certainly knew that she was subject to arrest simply because of her status. She had been married to Porfirio for seven years (2Tr. at 46) and he had been caught in the United States illegally several times before and had been returned to Mexico (1Tr. at 27). Therefore, it is not plausible that she signed the form due to threat of arrest when she clearly knew she could lawfully be arrested anyway.

d.    Ms. Galaviz testified that the officers entered the residence without their guns drawn, but then they drew their weapons and pointed them at "all of us together" when they told everyone to lean up against the wall (2Tr. at 70).

Case 4:06-cr-00260-ODS   Document 62   Filed 12/13/06   Page 25 of 51

It is not plausible that the officers would walk into an
unknown situation without a weapon drawn and wait until they
had encountered all of the people before drawing their guns.
Further, Sergio Javier Almeida-Alvarez testified that the
officers did not point a gun at him, and he was one of the
individuals in the living room along with Ms. Galaviz.

    e.    Ms. Galaviz testified that an officer was in the
living room swinging a bat while Detective Ortiz was present
and Porfirio was there (2Tr. at 74). There were four people
in the living room originally, Sergio entered, Porfirio
entered, Jose and Maria entered, Detective Ortiz was
present, a female officer was present, Detective Miller was
present, and the unidentified officer swinging the bat was
allegedly present (2Tr. at 76). It is implausible that all
of that activity could occur in a room as small as the
living room without someone getting hit by the bat, which
did not occur. Further, Detective Miller did not observe
anyone swinging a bat (2Tr. at 113), and Maria Almeida-Perez
testified that she did not see anyone with a bat (2Tr. at
149).

    f.    Ms. Galaviz testified that the police found only
one firearm in her home, and that was the one in her bedroom
(2Tr. at 77). However, there were five firearms seized from

the residence.  She later admitted that other firearms were seized (2Tr. at 78-79).

g.  Ms. Galaviz testified that the occupants waited over three hours for the search to be completed and then were taken outside.  However, Ms. Almeida-Perez testified that they were all inside for about a half an hour and then were taken outside.  The huge conflict in time between the testimony of these two witnesses diminishes the credibility of them both.

38.  Urbana Perez-Lopez, defendants' mother, testified during the hearing.  Portions of her testimony conflict with the findings of fact listed above.  Below is a summary of that conflicting testimony:

Ms. Perez-Lopez saw Sergio enter the house followed by police officers who directed them all to get against the wall with their hands up (2Tr. at 123). Some of the officers went to Porfirio's bedroom and some officers went to Jose's bedroom (2T. at 123).  No one asked for permission to enter the bedrooms (2Tr. at 124).

Ms. Perez-Lopez saw Detective Ortiz enter Porfirio's bedroom with his gun drawn, and he said, "Get up, this is the federal police." (2Tr. at 124).

27

Porfirio got up and he was taken to the living room and placed against the wall (2Tr. at 124). Jose and Maria were brought to the living room as well (2Tr. at 124-125).

The officers had searched about half the house when they asked who was the owner of the house (2Tr. at 126). They then asked for permission to search, but they had searched some already (2Tr. at 126).

Detective Ortiz told Porfirio, Jose, and Maria to "sign here" or the police would take everyone, and that occurred after the search had been completed (2Tr. at 127).

SA Raggs did not ask them if they were here legally or illegally (2Tr. at 128). Ms. Perez-Lopez is in the country illegally, but she does not remember whether any other officer asked her about her status (2Tr. at 128-129).

During this incident, a male officer was waiving a bat at her daughter-in-law about three times (2Tr. at 132-133). He did not waive it at anyone else (2Tr. at 133). He waived it at her and stared at her (2Tr. at 133). This was after she had signed the consent form

28

and the house had been searched (2Tr. at 133).  The man waiving the bat was white (2Tr. at 141).

39.  I do not find this testimony to be credible for the following reasons:

a.  Ms. Perez-Lopez is in the United States illegally. Her willingness to break the law in that respect diminishes her credibility.

b.  Ms. Perez-Lopez told the officers at the scene that she did not live at 5115 East 22nd Street.  However, during the hearing, she testified that she did live at that address on that day (2Tr. at 121-122).  Her willingness to lie to the authorities at her home increases the likelihood that she would lie while testifying.

c.  Ms. Perez-Lopez testified that she does not remember whether the officers asked her if she was here legally.  However, given her status (and the status of her entire family) as present in the country illegally, it is implausible that she would not remember if she was questioned about an issue that could result in her arrest and removal from the country.

d.  Ms. Perez-Lopez told the officers during the search that the more than $19,000 cash was from the sale of a truck (1Tr. at 20).  It is implausible that illegal aliens

29

would have a truck worth $20,000 to sell, especially since
Porfirio Almeida-Perez told the Pretrial Services Officer in
this case that he and all of his family members were
unemployed. It is also implausible that anyone would pay
almost $20,000 cash for a vehicle. Finally, the drug dog
alerted positively to the cash, indicating that the cash had
the scent of illegal drugs.

d. Ms. Perez-Lopez testified that once the police
entered, some of them went to Porfirio's bedroom and some of
them went to Jose's bedroom (2Tr. at 123). However, Maria
Juarez Galaviz testified that Detective Ortiz went into the
bedroom to get Porfirio before any other officers arrived
(2Tr. at 52). Sergio testified that he observed some
officer who was not Detective Ortiz go into Porfirio's
bedroom with the gun in his hand pointed forward, and he
then came out of the room with Porfirio (2Tr. at 36). All
of these versions of how many officers were present and who
went in to get Porfirio are significantly contradictory.

e. Ms. Perez-Lopez was asked whether the police found
anything during their search, and she responded, "Well, no -
- yes, they had already found something from where they
found my son there, but it couldn't be seen." (2Tr. at 126).
As in the case of Sergio, this answer is not responsive to

30

the question and appears to be Ms. Perez-Lopez's attempt to testify about the gun not being in plain view, without being asked about that.

f.   Ms. Perez-Lopez testified that the officers asked for permission to search, but they had done "half" the searching by then.  She later testified that after the search was complete, the officer told them to "sign here" or everyone would be taken.  Still later she went back to her earlier version where the officers did ask for permission to search but it was after they had started searching (2Tr. at 136).  Her testimony about when and how the officers obtained consent is inconsistent.

g.   Ms. Perez-Lopez was asked how she got to this country, and she was very evasive in her responses.  For example:

    Q.   And how did you get here?

    A.   One of my sister-in-laws sent for me.

    Q.   And how did you get -- I didn't ask who sent for you.  I said how did you get here?

    A.   One of my sisters-in-law sent for me.  She paid for the trip.

    Q.   I understand.  But you didn't have the legal ability to get into the United States, did you? You didn't have a visa, did you?

    A.   No.

31

> Q.    So, how did you get into the United States?
>
> A.    With a coyote [a Spanish term used for people who help others cross the border].

(2Tr. at 137-138).

Ms. Perez-Lopez's evasiveness during her testimony diminishes her credibility.

h.    Ms. Perez-Lopez testified that although she lived in the two bedroom house, she had never seen the two guns that were found lying on the bedroom floors, she had never seen any of the other guns, and she had never seen anyone in the house use drugs (2Tr. at 138-139).  It is implausible that someone could live in a small house and not see long barreled guns lying on the bedroom floors (and Porfirio testified that he had brought them down to show a friend two or three days earlier, so it is clear they had not been hidden).  In addition, this testimony is inconsistent with other testimony that everyone in the house used cocaine.

40.    Maria Almeida-Perez, defendants' sister, testified during the hearing.  Portions of her testimony conflict with the findings of fact listed above.  Below is a summary of that conflicting testimony:

> On July 6, 2006, while Ms. Almeida-Perez was sleeping, a black man entered her bedroom pointing a

gun, and woke up her brother Jose Almeida-Perez (2Tr. at 144). Detective Ortiz approached Ms. Almeida-Perez, and he also had a firearm in his hand pointed at the bed (2Tr. at 145). Detective Ortiz told her to get up and go into the living room (2Tr. at 145). Jose Almeida-Perez was escorted out into the living room (2Tr. at 145).

In the living room there were many officers, and the other occupants of the house had their hands up (2Tr. at 147). She was told to put her hands up against the wall (2Tr. at 147-148). She stood like that for about a half an hour, and then they were all taken outside (2Tr. at 148).

Ms. Almeida-Perez did not hear Detective Ortiz ask for permission to search the house, nor did she hear him explain a document to her brothers (2Tr. at 149).

The officers had their guns pointed at the occupants while they were in the living room and while they were taking them all outside (2Tr. at 149).

41. I do not find Ms. Almeida-Perez's testimony to be credible for the following reasons:

a. Ms. Almeida-Perez is in the United States illegally, as is every other member of her household (2Tr.

33

at 153).  According to her brothers, Ms. Almeida-Perez uses cocaine.  Her willingness to unlawfully enter the United States and allegedly use cocaine diminishes her credibility.

b.   Ms. Almeida-Perez testified that she lived at 5115 East 22nd Street on July 6, 2006, and had lived there for more than three months at the time; however, she told police that day that she did not live there (2Tr. at 143, 146). Her willingness to lie to authorities on the day of the search increases the likelihood that she would lie while testifying.

c.   Ms. Almeida-Perez testified that she never saw any guns at the residence, including the gun that was found in plain view on the floor in the room where she was sleeping and while she was sleeping (2Tr. at 146).  This is not plausible, especially since Jose Almeida-Perez told police the day after the search that the guns had been brought downstairs to show someone "two to three days before" the police arrived, and that he had forgotten to take them back upstairs (P. Ex. 6).  In addition, Porfirio Almeida-Perez testified at the hearing that the guns had been downstairs for two or three days, consistently with what he had told police on July 7 (2Tr. at 163).  Porfirio also testified that he set the gun down on the floor in the room where Ms.

34

Almeida-Perez had been sleeping, so Jose could not have brought the gun to the room after Ms. Almeida-Perez fell asleep (2Tr. at 164). There simply is no plausible way that Ms. Almeida-Perez could have not seen the firearm lying on her bedroom floor.

d. Ms. Almeida-Perez testified that she and the others stood with their hands against the wall for about a half an hour and then they were all taken outside (2Tr. at 148). However, Ms. Galaviz testified that the occupants waited over three hours for the search to be completed and then were taken outside. The huge conflict in time between the testimony of these two witnesses diminishes the credibility of them both.

e. Ms. Almeida-Perez testified that the officers had their guns pointed at the occupants while they were in the living room and also while they were being taken outside. However, on cross examination, she testified that SA Raggs had his gun out but it was pointed down, not at the occupants, and that the female officer who she earlier had said was pointing her weapon actually had her gun put away (2Tr. at 150). Then she testified that only one officer had a gun out, which is significantly different from her original testimony that the officers had their guns pointed

35

at the occupants while they were in the living room and while they were being taken outside.

f. Ms. Almeida-Perez testified that she did not see Detective Ortiz speak to her brother Porfirio (2Tr. at 151). However, she also testified that she heard Detective Ortiz ask Porfirio if there were any drugs in the house (2Tr. at 151). She testified that Porfirio's answer was "no"; however, that conflicts with the testimony of Porfirio that he tried to find the cocaine (2Tr. at 165). He then said that everyone in the family uses cocaine and someone must have used it. Porfirio made that statement again on a subsequent day while being interviewed by police, as did Jose (P. Ex. 6; P. Ex. 7).

g. Ms. Almeida-Perez testified that a black man entered her bedroom and woke up her brother Jose while Detective Ortiz pointed a gun at her (2Tr. at 144-145). However, Jose Almeida-Perez testified that Detective Ortiz and a "white man" entered the bedroom and woke him and Maria up (3Tr. at 6).

42. Defendant Porfirio Almeida-Perez testified during the hearing. Portions of his testimony conflict with the findings of fact listed above. Below is a summary of that conflicting testimony:

36

Two officers came into Porfirio's bedroom and woke him up (2Tr. at 157). Detective Ortiz had his gun pointed at Porfirio (2Tr. at 158). Porfirio went out to the living room and stood with his hands against a wall, and one of the officers stayed in Porfirio's bedroom (2Tr. at 159). When Porfirio came into the living room, there were "many, many" police there (2Tr. at 168). He saw an officer with a bat but did not see him swing it because he was facing the wall (2Tr. at 168).

Detective Ortiz told Porfirio that the police would take all of his family if he did not sign the form (2Tr. at 161). He did not explain the form (2Tr. at 161). Detective Ortiz was pointing his gun at Porfirio's family members at the time (2Tr. at 161). Porfirio did not know when he signed the form that he was consenting to a search of his house (2Tr. at 162).

The day after the search when Porfirio was in jail, Detective Ortiz came to talk to him (2Tr. at 169). Detective Ortiz threatened Porfirio by saying if he did not sign the paper, Detective Ortiz would "go back and arrest you and your family." (2Tr. at 169).

37

So Porfirio signed the paper (the <u>Miranda</u> waiver) (2Tr. at 169).

43. I do not find this portion of Porfirio Almeida-Perez's testimony to be credible for the following reasons:

a. Porfirio Almeida-Perez is in the United States illegally (2Tr. at 166). He admitted that he uses cocaine, he admitted that the firearms and cocaine belonged to him. Porfirio's willingness to participate in these crimes diminishes the chances that he is someone who would testify truthfully under oath.

b. If both officers came into the bedroom to wake up Porfirio, that left no officers in the living room with the others. That is inconsistent with the testimony of the people who were in the living room, and it also makes no sense that the police would leave four or five people alone in a room while they both went into Porfirio's room, and then later come out to the living room and make all of the people stand with their hands against the wall. The credible evidence establishes that only Detective Ortiz and SA Raggs were inside the house at the time Porfirio and Jose were awakened.

c. Porfirio testified that the officers searched the house while he and the others were outside (2Tr. at 160).

However that conflicts with the testimony of the others, that the search was going on while they were all standing against the wall.

    d.   Porfirio Almeida-Perez testified that he saw someone with a bat but he did not remember what his face looked like (2Tr. at 168). Maria Galaviz testified that some unknown officer swung the bat for ten minutes (2Tr. at 74). Maria Almeida-Perez testified that she never saw anyone with a bat (2Tr. at 149). The testimony of the occupants of the house with regard to the officer and the bat is conflicting. Some said they saw the person swinging the bat for a long time, some say they saw the officer swing the bat three times, some said they saw the person with the bat but not swinging it, and some said they never saw anyone with a bat. Additionally, no one was ever able to give even the slightest description of the bat-wielding officer other than that he was lighter than Detective Ortiz (2Tr. at 36, 73-74, 132-133, 141, 168; 3Tr. at 6, 13). None of the officers present ever saw a bat, including the detective who was called by the defense. The testimony about an officer having a bat or swinging a bat is not credible.

    e.   Porfirio testified that he signed the <u>Miranda</u> waiver because he was threatened by Detective Ortiz. The

<u>Miranda</u> waiver was written in Spanish, so Porfirio was able to see what he was signing (2Tr. at 170). In addition, a threat of arrest is not a valid threat since Porfirio had already been arrested and was in jail. Finally, Porfirio testified that he was asked whether he would talk to Detective Ortiz and he agreed to (2Tr. at 169). If Detective Ortiz had threatened Porfirio on the day of the search, it is not plausible that he would willingly go talk to the detective and allegedly subject himself to further threats by the same officer.

  f. When Porfirio was asked by his attorney what side of the bed he had been sleeping on, he pointed to the left side. When further questioned by his attorney, he pointed to the right side (2Tr. at 171-172). When that discrepancy was mentioned in court, Porfirio stated that he was confused and thought they were talking about the firearm (2Tr. at 172). However, it is not plausible that Porfirio would misunderstand. The question was, "[W]hat side of the bed were you sleeping on? Were you sleeping on the right side or the left side?" (2Tr. at 171). I fail to see how he could think he was being asked where the firearm was, especially since the firearm was on the floor, not on the bed. It is my opinion that Porfirio Almeida-Perez did not

testify truthfully, rather he was attempting to select
answers that would benefit his case.

44.   Defendant Jose Almeida-Perez testified during the
hearing.  Portions of his testimony conflict with the
findings of fact listed above.  Below is a summary of that
conflicting testimony:

He was awakened by someone saying, "Police" (3Tr.
at 5).  He was told to put his hands up, and he put his
hands on his neck (3Tr. at 5).  There were two police
officers in his bedroom, and one more in the house
(3Tr. at 6).  Detective Ortiz was in the bedroom, and a
"white guy" with a gun was in there as well (3Tr. at
6).

Jose was taken to the living room and told to put
his hands against the wall (3Tr. at 5, 7).  He had to
stand facing the wall with his hands up for about a
half an hour (3Tr. at 7).

While he was standing against the wall, the police
were searching the house (3Tr. at 8).  No one asked him
for permission to search the house (3Tr. at 9).  He
signed the consent to search form after the house had
already been searched (3Tr. at 9).

41

45.  I do not find portions of Jose Almeida-Perez's testimony to be credible for the following reasons:

a.  Jose Almeida-Perez is in the United States illegally.  He admitted that his entire family uses cocaine.  Jose's willingness to participate in these crimes diminishes the chances that he is someone who would testify truthfully under oath.

b.  Jose was asked whether he heard the police say what they were doing in the house (3Tr. at 8).  Jose answered, "[T]hey were searching, and then after they got done searching, they said sign here.  And they said if we don't sign here, that we're going to take everybody." (3Tr. at 8).  This was not responsive to the question, and it appears that Jose was attempting to blurt out the gist of his defense, i.e., that the search went forward without permission, that the form was signed afterward, and that the form was signed under threat of arresting the entire family.

c.  Jose testified that he did not remember whether Detective Ortiz explained the consent to search form or told Jose that he did not have to sign it (3Tr. at 9).  This is inconsistent with his testimony that he was told to sign the form or his whole family would be arrested.

42

d.   Jose Almeida-Perez testified that Detective Ortiz and a "white man" entered the bedroom and woke him and Maria up (3Tr. at 6).  However, Maria Almeida-Perez testified that a black man entered her bedroom and woke up her brother Jose while Detective Ortiz pointed a gun at her (2Tr. at 144-145).  These versions are entirely inconsistent.

### III. *CONSENT TO SEARCH*

Even when police officers have neither probable cause nor a warrant, they may search an area if they obtain a voluntary consent from someone possessing adequate authority over the area.  <u>United States v. Matlock</u>, 415 U.S. 164, 171 & n. 7 (1974); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973).  Voluntary consent need not amount to a waiver. <u>United States v. Chaidez</u>, 906 F.2d 377, 380 (8th Cir. 1990).  Consent can be voluntary without being an "intentional relinquishment or abandonment of a known right or privilege." <u>Bustamonte</u>, 412 U.S. at 235.  The proper test is whether the totality of the circumstances demonstrates that the consent was voluntary.  <u>Id</u>. at 226.

The government bears the burden of proving a voluntary consent to search by a preponderance of the evidence. <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548 (1968); <u>United States v. Ramey</u>, 711 F.2d 104, 107 (8th Cir. 1983).  The

43

question of whether the consent was voluntarily given is a question of fact for the trial court.  United States v. Cortez, 935 F.2d 135, 142 (8th Cir. 1991); United States v. Alberts, 721 F.2d 636 (8th Cir. 1983).  Consent is voluntary if it was "the product of an essentially free and unconstrained choice by its maker" rather than the product of duress or coercion, express or implied.  Bustamonte, 412 U.S. at 225, 227.  This determination depends upon the totality of the circumstances in a particular case.  Id. at 226.

Here, the credible evidence is that Sergio Javier Almeida-Alvarez was seen by police repeatedly entering and exiting the residence, without knocking and obtaining permission to enter.  Two police officers approached Sergio, who was sitting on the porch, and asked if they could come inside to talk about a narcotics investigation.  Sergio voluntarily allowed the officers to enter, and he opened the door to the residence without knocking.  There is no evidence that Sergio was coerced into allowing the officers to enter the residence.

The credible evidence establishes that Detective Ortiz explained to the people in the living room that he was there to talk about a narcotics investigation, and asked whether

44

there was anyone else present.  He obtained permission to go into the bedrooms to get the other occupants up and bring them to the living room, which he did.  There is no credible evidence that anyone was threatened or coerced into giving permission to enter the bedrooms.

The credible evidence establishes that once everyone was in the living room, Detective Ortiz again explained who he was and that he was there in connection with a narcotics investigation.  He also said that Special Agent Raggs was present because they had information that the people in this residence were in the country illegally.

The credible evidence establishes that Detective Ortiz asked who owned or rented the house, and he was told that Porfirio Almeida-Perez, Jose Almeida-Perez, and Maria Juarez Galaviz were responsible for the house.  As a result, he directed his conversation to them.  It is undisputed that Detective Ortiz only requested permission to search from the three individuals who had stated they lived there, as everyone else present (except Sergio) lied and said they did not live at that address.

The credible evidence establishes that Detective Ortiz asked for permission to search the residence for narcotics, weapons, and currency.  Porfirio, Jose, and Maria all gave

45

permission and signed the consent to search form after it had been explained to them and after they had been told that they did not have to consent.  As another example of their cooperation, Porfirio Almeida-Perez told Detective Ortiz that there was cocaine present in the residence and he attempted to find it.

Because no protective sweep had been performed, Detective Ortiz asked permission to have more officers come in and help with the search.  The residents said there was no one else in the house, but gave their permission to have other officers come inside to look.

There is no credible evidence of duress or coercion, express or implied.

Because defendants voluntarily consented to the search of their residence, their motions to suppress on this basis should be denied.

**IV.  *WAIVER OF <u>MIRANDA</u> RIGHTS***

Defendants argue that they did not knowingly and voluntarily waive their <u>Miranda</u> rights.

The government bears the burden of proving by a preponderance of the evidence that defendant made a knowing and voluntary waiver of his <u>Miranda</u> rights.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 158 (1986); <u>United States v.</u>

46

Dougherty, 810 F.2d 763, 772 (8th Cir. 1987). There is no requirement that, to be voluntary, the waiver be the product of a free will. Connelly, 479 U.S. at 170. The sole concern of the Fifth Amendment, upon which Miranda was based, is governmental coercion. Id.; United States v. Washington, 431 U.S. 181, 187 (1977). The voluntariness of a waiver of this privilege depends on the absence of police overreaching, i.e., the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Connelly, 479 U.S. at 170; Moran v. Burbine, 475 U.S. 412, 420 (1986); Fare v. C., 442 U.S. 707, 726-27 (1979).

An explicit statement of waiver is not invariably necessary to support a finding that the defendant waived his Miranda rights. North Carolina v. Butler, 441 U.S. 369 (1979). An express written or oral statement of waiver of Miranda rights is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. Id. at 373.

> The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived his rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That doesn't mean that the defendant's

47

silence, coupled with an understanding of his rights
and course of conduct indicating waiver, may never
support a conclusion that a defendant has waived his
rights. . . . [I]n at least some cases waiver can be
clearly inferred from the actions and words of the
person interrogated.

Id. at 373.

Whether a defendant waived his Miranda rights is a
question of fact for the trial judge and must be determined
on the particular facts and circumstances surrounding the
case, including the background, experience and conduct of
the accused. Id. at 374; United States v. Dougherty, 810
F.2d 763, 772 (8th Cir. 1987); Stumes v. Solem, 752 F.2d
317, 319 (8th Cir. 1985). The totality of the circumstances
test applies. Dougherty, 810 F.2d at 773.

In this case, Porfirio Almeida-Perez admitted that he
was asked while in jail whether he would talk to Detective
Ortiz, and he voluntarily said he would. Both defendants
were presented with Miranda waiver forms written in Spanish.
Detective Ortiz read the form to the defendants word for
word in Spanish, and then asked them if they understood
their rights and whether they were willing to answer
questions. Both defendants said they understood their
rights and were willing to answer questions. They both
signed the Miranda waiver forms.

48

There is no evidence (or allegation, for that matter) that either defendant was under the influence of alcohol or drugs. Both had been in custody since the previous day. Neither defendant asked for an attorney or invoked his right to remain silent. There is no credible evidence that either defendant was coerced or threatened.

I find that defendants were advised of their <u>Miranda</u> rights, they voluntarily waived those rights, and they voluntarily provided very brief statements to the police. Therefore, defendants' motion to suppress their statements should be denied.

## V. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III and IV, I make the following conclusions of law:

1. Detective Ortiz and Special Agents Raggs lawfully entered the residence with the consent of Sergio Javier Almeida-Alvarez who had been seen by the officers entering and exiting the residence freely and who voluntarily entered the residence without knocking, allowing the officers entry.

2. Detective Ortiz knocked on the bedroom doors and entered them with the voluntary consent of the residents in the living room.

3.    Detective Ortiz obtained voluntary consent from Porfirio Almeida-Perez, Jose Almeida-Perez, and Maria Juarez Galaviz to search the residence for narcotics, weapons, and currency.

4.    Porfirio Almeida-Perez, Jose Almeida-Perez, and Maria Juarez Galaviz voluntarily signed the consent to search form after having been advised of the form's contents and after having been advised that they did not have to sign the form or consent to the search if they did not want to.

5.    Law enforcement officers searched defendants' residence with voluntary consent.

6.    Porfirio Almeida-Perez and Jose Almeida-Perez were informed of their Miranda rights, understood those rights, and voluntarily waived those rights prior to making statements.

Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying both motions to suppress evidence and statements.

Counsel are advised that, pursuant to 28 U.S.C. §
636(b)(1), each has ten days from the date of this report
and recommendation to file and serve specific objections.


                                    /s/ Robert E. Larsen
                                    ROBERT E. LARSEN
                                    United States Magistrate Judge

Kansas City, Missouri
December 13, 2006

Case 4:06-cr-00260-ODS   Document 62   Filed 12/13/06   Page 51 of 51